OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant was convicted of grand larceny in the second degree, grand larceny in the third degree, conspiracy in the fourth degree and 20 counts of offering a false instrument for filing in the first degree. The charges were based on a scheme to defraud the New York State Medicaid system by billing in violation of the Medicaid regulations. Before and during the trial, the defense repeatedly asked that all charges be dismissed on the ground that the defendant’s interpretation of the Medicaid regulations was correct and consequently her conduct was proper. This court rejects the defendant’s interpretation of the rules and finds no legal defense based on them.
1. THE STRUCTURE OF DEFENDANT’S CORPORATIONS.
As background for understanding the regulations and how they applied to the defendant, it is significant to know the structure of defendant’s corporations. The defendant was an officer and owner of United Ultrasound. United had a Medicaid identification number and billed Medicaid for sonograms and echocardiograms, and as a biller was a provider under the Medicaid regulations. (18 NYCRR 504.1 [d] [19]; 504.9.) At first United employed sonogram technicians who went to outside clinics to take the images, that is the sonograms and echocardiograms, requested by the doctors who ordered them. Later on, the images were made by technicians affiliated with the outpatient clinics that had the requesting doctors on staff. The images were then brought to United’s office in the Bronx. In both situations, the employees of defendant at United would process the billing for the sonograms and echocardiograms and send the claims on magnetic diskettes to Medicaid for payment.
After processing the billing, the employees would forward the images to radiologists or cardiologists who were to read them and prepare diagnostic reports based on the images. The radiologists or cardiologists who were to read the images were under contract to one of nine other companies owned and *350 directed by defendant.[1] These companies had their own Medicaid identification numbers as providers and constituted group practices made up of the reading doctors. The companies were the payees of the Medicaid checks resulting from defendant’s billing on the diskettes.
The doctors returned to the defendant’s billing company, United, the diagnostic reports based on their readings of the images. If the images were suboptimal, or below quality so the image could not be read for diagnosis, the doctor would tell the defendant’s employees either in writing or orally.
When Medicaid prepared the checks for the defendant’s nine companies based on the billings her companies submitted, the checks were sent to the defendant at an office in Manhattan and the defendant paid the doctors who were under contract to her companies at a flat fee of about $15 for each reading. In addition, she paid her employees, either the sonogram technicians or those people who performed billing or other functions at United.
2. count one: billing without a reading of the images
Count one of the indictment charged defendant with knowingly billing Medicaid for completed sonograms and echocardiograms before they were read by radiologists or cardiologists. This charge included the billing for those images that could not be read because they were suboptimal.
The defense’s sole legal attack on the count was that the Medicaid regulations allowed billing of suboptimal images. She argued that because a regulation of the New York State Department of Social Services set out in 18 NYCRR 533.6 (c) (2) (iii) did not allow billing for a second image necessitated by a technical failure, she must have been authorized to bill for the first suboptimal image. The prosecutor’s position was that a suboptimal image could not result in a diagnostic report by a doctor and that the Medicaid rules as well as Social Services regulations permitted billing for only a sonogram or echocardiogram that included both the taking of the image by a technician and the reading of the image by a medical professional.
*351 a. Medical Billing Procedures
The relevant instructions for providing care and for billing the Medicaid system are set out in the regulations of the State Department of Social Services in 18 NYCRR (hereinafter Regulations) and in the providers’ manual (hereinafter Manual). Claims for payment were due and owing only for services actually provided. (18 NYCRR 504.9 [b].) Billing for services could be done by a hard copy claim form or magnetic diskettes could be used to bill for multiple or bulk claims and the information that would be put on a hard copy form would be placed on a diskette for each claim. (See, 18 NYCRR 504.9 [a] [2].) A contract, the magnetic input provider agreement, required the provider billing by diskette to follow the rules for billing on the hard copy claim forms. Assurances by the provider that the rules were satisfied were also made on a form called a provider magnetic input certification that was attached to each diskette submitted to Medicaid for payment.
The claim forms[2] had to include the date of the service, the name and Medicaid identification number of the patient. It also provided the five-digit procedure code that identified the service rendered to the patient. In some circumstances, another two-digit number called a modifier was included to provide additional information about circumstances of the care or the service. (18 NYCRR 533.6 [e]; Manual § 3.2 [24D], at 3-51.) The Regulations and the Manual listed in table form all the procedure code numbers and the permissible reimbursement amounts. (18 NYCRR 533.6 [f]; Manual, at 7-7 et seq.) The claim form also included the name of the reading physician and that physician’s identification number as well as any group practice that was to receive the payment and the Medicaid identification number of the group. (Manual § 3.2 [25C], at 3-69.)
b. Specific Medicaid Requirements for Billing for Ultrasound Services
The services involved in this case were diagnostic ultrasound services (Manual § 2.2.5, at 2-59 — 2-62), that is sonograms and echocardiograms. These were classified in the Manual as "ordered ambulatory services,” which were defined as "a specific service performed by a hospital or diagnostic and treatment center on an ambulatory basis upon the order of *352 the qualified physician, physician’s assistant, dentist or podiatrist to test, diagnose or treat a Recipient or a specimen taken from a Recipient.” (Manual § 2.2.5 [A], at 2-59.) Payment for outpatient radiology services was made in accord with the fee schedule with one exception not applicable here. (18 NYCRR 533.6 [d].)
The procedure codes for echocardiography and the allowed reimbursement amounts were set out in 18 NYCRR 533.6 (f) (4) and also in a portion of the Manual table called the "Medicine Section.” Significantly, the echocardiography section referred to the radiology section and its codes 76620-76632 when the echocardiogram was a radiologic procedure. (Manual, at 7-68.)
A comparison of the procedures listed in the echocardiography portion of medical section of the Manual with the procedures listed in the diagnostic ultrasound portion of the radiology section of the Manual showed the procedures and fees were identical; only the code numbers were different. Pairing the code numbers disclosed the following:
[[Image here]]
Also relevant for this case were the other ultrasound procedures, for the abdomen and retroperitoneum (code numbers 76700, 76705, 76770, 76775) that had no analogues in the echocardiological table.
Instructions that related to diagnostic ultrasound procedures, whether they appeared in title 18 of the NYCRR or in the Manual, permitted payment only when both a technical component and a professional component had been performed, that is an image had to be taken, and then it had to be read or interpreted for diagnosis and, finally, a diagnostic report of the interpretation had to be furnished to the requesting *353 professional. Thus, the fees listed in 18 NYCRR 533.6 (f) and in the Manual included both the professional component and the technical and administrative component of radiology services. (18 NYCRR 533.6 [b].) In the radiology section of the Manual, the general instructions stated that "[l]isted fees represent maximum allowances for reimbursement purposes in the Medical Assistance Program and include the administrative, technical and professional component of the service provided.” (Manual, at 7-338.) And they defined the service provided as "an interventional radiologic procedure or diagnostic study * * * supervision of the study and interpretation of results.” (Manual, at 7-338.)
In the Regulations, the professional component was defined as
"the various professional services performed by physicians including * * *
"(b) studying the results of diagnostic * * * procedures * * *
"(c) dictating examination or treatment reports; and
"(d) consulting with and furnishing written reports to referring physicians regarding the results of diagnostic procedures.” (18 NYCRR 533.6 [b] [1] [i].)
Tracking the Regulations, the Manual explained that the professional component included "study and evaluation of results obtained in diagnostic * * * procedures * * * dictating report of examination or treatment [and] * * * consultation with referring physician regarding results of diagnostic procedures.” (Manual, at 7-339.) The Manual’s instructions specifically applicable to diagnostic ultrasound, stated: "Dollar values include consultation and a written report to the referring physician.” (Manual, at 7-340.)
The technical and administrative component was the technologists and the necessary supplies provided by the hospital (18 NYCRR 533.6 [b] [2] [i] [a]), or the clinic. (18 NYCRR 533.6 [d].) The technical component included "cost or charges for technologists.” (Manual, at 7-339.)
The Manual prescribed that billing was not permitted until the diagnostic report was returned to the medical professional who had asked for the procedure. Describing the procedures for ordered ambulatory services the Manual stated: "Payment may be made for [such] service only if the report of that test, procedure or treatment has been furnished to the ordering practitioner.” (Manual § 2.2.5 [E], at 2-62.)
*354 Significantly, the instructions about the modifiers to be used set out in both the echocardiography and radiological sections of the Manual stated that "[cjertain procedures are a combination of a physical component and a technical component” and that separate reporting of the physician component should be designated by use of the modifier " — 26.” (Manual, at 7-11 [medical], 7-341 [radiology].) If a provider intended to bill separately for the professional component, the appropriate billing would be for 40% of the amount of payment designated in the Manual’s table. Otherwise, the claim was for the total service. Separate billing of the professional and technological components of the service did not include instances in which the professional component was not carried out; rather, the separate billing was to deal with special circumstances involving hospitals and clinics. (18 NYCRR 533.6 [e] [1], [2]; Manual, at 7-341 [the TC modifier].)
All of these portions of the Manual were consistent in their instruction that the billing under the code numbers was for the taking of the image, the diagnostic report of the reading physician and submission of the report to the ordering physician.
c. The Defendant’s Interpretation for Billing Without Both the Professional and Technical Component
Notwithstanding the consistent and unambiguous regulatory scheme set out above, the defendant argued that she was entitled to be paid for a suboptimal image because under the Manual she could not be paid for a second image necessitated by the faulty first one. The Medicaid rules, she maintained, permitted billing for one image and if one could not bill for the second image, then by implication, billing was permitted for the first image. Defendant relied for this interpretation on 18 NYCRR 533.6 (c) (2) (iii).
This regulation precluded payment for repeat procedures on the same part of the body for the same illness when repetition was needed because of technical or professional error in the first procedure. The defense was correct in asserting that she would not be paid for taking a second image if the first one was technically deficient or suboptimal. However, billing for the first defective image as a procedure that included both the technical and professional components runs afoul of the regulatory scheme already set out above. It was simply not permissible to do so. Indeed, the Manual reenforced the Regulations and allowed billing only if the repeated *355 procedure was needed for reasons other than technical or professional error. (Manual, at 7-341.) It required the use of the modifier " — 76” to identify this second billing. (Id.) The defendant’s belief that she was treated unfairly because unsuccessful efforts were not compensated did not allow her to bill contrary to the Regulations. By agreeing to participate as a provider she was obliged to follow all the rules in the State’s regulatory scheme whether she approved of them or not, and whether she felt fairly compensated or not.
Defendant’s second argument was that a physician interpreted the sonogram or echocardiogram when he or she concluded it was suboptimal and therefore not diagnostically readable and that such an interpretation constituted the professional component of a claim. However, as set forth above, the professional component was defined in the Regulations to be the study and evaluation of results obtained in diagnostic procedures, the dictation of a report of examination or treatment, and the consultation with the referring physician regarding results of diagnostic procedures. (18 NYCRR 533.6 [b] [1]; accord, Manual, at 7-339.) When an image could not be read, the professional component remained unsatisfied because there could be no diagnosis to go to the requesting doctor. Whether the defendant’s contract with the doctors required her to pay them for determining that an image was suboptimal was between the defendant and the doctors; it had nothing to do with whether the State Medicaid system would pay for a suboptimal image. Accordingly, this court rejects defendant’s definition of the professional component as inconsistent with the Regulations.
3. COUNT TWO: REBILUNG OF "712” REJECTIONS.
Count two of the indictment charged the defendant with improperly using a waiver letter to rebill for work using one procedure code when a claim for the same work had been rejected under another code. The defendant claimed she did not rebill using the waiver letter and that therefore the fraud charged was not proven.
In count two, the defendant was charged with a series of acts violating the Manual. Using the paired procedure codes in the radiological and echocardiography sections set out above (at 352), defendant billed Medicaid using one of the procedure codes. Some of these claims were rejected because they were for services that had been given too close in time to *356 a previously given service, what was called by Medicaid a "712 rejection.” When such a 712 rejection occurred, the defendant resubmitted the claim using the procedure code from the other section that designated the same procedure and service as had been included in the first claim form. For instance, if a claim had been rejected when filed with the 76627 code, it was resubmitted using the 93307 code. A waiver letter was sent with each diskette giving a single reason for the late filings — a delay in determining the eligibility of the patient for Medicaid.
a. Late Billing and Rebilling Under Medicaid Regulations
According to the Manual, all claims for Medicaid payment had to be submitted within 90 days of the date of service, unless a delay was beyond the provider’s control. All claims submitted after 90 days were to be accompanied by a statement of reasons for the delay. (Manual, at 3-66.) The Manual listed five reasons justifying a delayed filing, including a delay in the determination of whether a patient was eligible for Medicaid and a denial of the claim for a reason unrelated to late filing. (Manual, at 3-67.)
A letter of explanation, called a waiver letter, had to set out the reason for the delay beyond 90 days and had to be attached to the claim for payment. For a single claim, the letter was to be attached to the claim form. For multiple or "batch” submissions, providers were to "[s]ubmit the claims with a cover letter of one or more pages detailing one of the acceptable reasons for the late submission * * * [The] number of each invoice in the batch * * * [had to] appear on the front side only of the cover letter. If there * * * [were] more invoice numbers to be listed,” additional pages were to be used. (Manual, at 3-67.) Under the magnetic input provider agreement, waiver letters also had to be provided for claims in machine readable form, that is on diskettes. Further, the transmittal certification accompanying each disk affirmed that the claims made were properly submitted.
Previously denied claims could be resubmitted for payment unless the claims violated good medical practice or program policy. A claim would be denied if it was duplicative of a prior claim. A resubmitted claim had to be put on a new form. (Manual, at 3-77.)
b. The Defendant’s Conduct Violated the Rules
Defendant’s conduct directly violated the Regulations by resubmitting a claim against program policy and then filing *357 by a waiver letter with a false reason given for the late filing.
The defendant sought dismissal of count two on several grounds. First, she claimed that only a single reason had to be placed on the waiver letter and if that one reason was correct as to some of the claims on the diskette it did not matter that it was incorrect as to others. However, the magnetic tape agreement promises compliance with the Regulations by those submitting claims on diskettes. The Regulations required an explanation of the lateness for each claim submitted and the waiver letter used by defendant did not do that. The defense claimed that because the Manual used the singular word "reason,” only one reason need be given for all claims submitted on a disk. However, that misreads the rule, which plainly requires a reason for each delayed submission. (Manual, at 3-67.)
The defendant next claims that Medicaid did not accept the resubmission and make payment based on the waiver letter, but because they must have found the claim to be proper. The scheme that formed the basis of the accusations relied on several acts in violation of the Regulations and the People were entitled to frame the charges to reflect the scheme as it could be proved: that defendant used both a second procedure code and a waiver letter. Further, defendant’s argument is not a legal one but a factual one and it was up to the Grand Jury to decide if the waiver letter was used in the scheme; it did so.
Defendant claimed as a matter of law the Regulations that applied to radiological services did not apply to those services listed in both the radiology and cardiology sections. However, the reading of the Regulations show that the echocardiography procedures were considered in the radiology section, which included diagnostic ultrasound. (18 NYCRR 533.6 [¶] [4].) The cardiology section of the Manual dealing with echocardiography procedures referred the provider to the ultrasound procedure codes in the radiology section. Furthermore, defendant herself understood that the radiology section applied to echocardiograms. For example, to support her claims that as a matter of law she was entitled to bill for suboptimal images and that count one should be dismissed, she relied on the Department of Social Services Regulations for radiology.
The court adheres to the prior orders denying motions to dismiss the indictment on the ground of insufficient proof before the Grand Jury.

. The nine companies were Bronx Ultrasound, Kings Ultrasound, Gramercy Sonogram, Brooklyn Sonogram, Queens Ultrasound, Bruckner Sonogram, Empire State Ultrasound, Superior Sonogram and Metropolitan Sonogram.

. A copy of the form was set out in the Manual and each line was specifically annotated with instructions for completion. (Manual, at 3-11 — 3-73.)